In re: A. R. Martin-Trigona, #84–5018 | Appealing order of civil contempt | Anthony R. Martin-Trigona (A) Richard Belford; Daniel Meister (E) | Emergency stay denied

* Appellant(s)
** Appellee(s)

*** Petitioner
**** Respondent

**UNITED STATES of America, ex rel. Martin J. REILLY, Jr., Plaintiffs-Appellees,**

v.

**NEW ENGLAND TEAMSTERS AND TRUCKING INDUSTRY PENSION FUND and First National Stores, Defendants,**

**New England Teamsters and Trucking Industry Pension Fund, Defendant-Appellant.**

**No. 817, Docket 83–6259.**

United States Court of Appeals, Second Circuit.

Argued March 29, 1984.

Decided June 28, 1984.

Robert A. Brooks, Asst. U.S. Atty., Alan H. Nevas, U.S. Atty., Hartford, Conn., on brief, for plaintiffs-appellees.

Norman Zolot, Hamden, Conn., for defendant-appellant.

Before KAUFMAN, KEARSE and PIERCE, Circuit Judges.

KEARSE, Circuit Judge:

Defendant New England Teamsters and Trucking Industry Pension Fund (the "Fund") appeals from a judgment of the United States District Court for the District of Connecticut, Jose A. Cabranes, *Judge*, awarding Martin J. Reilly, Jr., pension benefits under the Fund's "Minimum Thirty Year Service Pension," pursuant to the Veteran's Reemployment Rights Law (the "Act"), 38 U.S.C. §§ 2021–2026 (1982), on the ground that Reilly was entitled to pension credit for a 15-month period of training and hospitalization when he was on duty as a National Guard reservist and therefore had the 30 years of service credits required for the pension. On appeal, the Fund contends that the court erred in awarding such benefits because (1) Reilly had failed to comply with the requirements of § 2024(d), (2) Reilly had waived his rights, and (3) benefits under the Fund's plan are not perquisites of seniority within the meaning of § 2024(d). Finding no merit in any of these contentions, we affirm the judgment.

## I. BACKGROUND

Most of the pertinent facts have been stipulated to by the parties in a Statement of Issues Not in Dispute ("Stipulation").

### A. *Reilly's Employment and Military History*

Reilly was born on March 14, 1925, and was first employed by defendant First National Stores ("FINAST") in other than a temporary position on June 11, 1946. He remained employed by FINAST until September 1950, when he left to serve in the Connecticut National Guard during the Korean conflict. Reilly was honorably discharged in July 1952 and was reemployed by FINAST. (Stipulation ¶¶ 1–3.) There is apparently no dispute that Reilly received pension credit for the time served during the Korean conflict.

On June 20, 1958, Reilly began a two-week National Guard encampment. During this tour of duty, however, Reilly suffered a service-related injury, and his period of active duty status was extended until August 20, 1959. (Stipulation ¶ 4.) According to Connecticut National Guard officials whose statements have not been disputed by the Fund, Reilly was hospitalized for more than nine months during this period and then continued his recuperation at home; during the entire period from June 1958 to August 1959, Reilly received military pay and allowances. From August 21, 1959, until September 4, 1959, Reilly re-

mained in military service to fulfill his annual obligation in the Guard. (Stipulation ¶ 4.) Reilly returned to work at FINAST in September 1959 immediately after his military obligation had been fulfilled. (Stipulation ¶ 5.) Reilly received no pension credit for the period from June 1958 to September 1959. (Stipulation ¶ 6.)

### B. *The Fund Pensions*

In 1967, FINAST entered into an agreement with the Fund for the Fund to provide pension benefits for certain of its employees. FINAST thereby became a "contributing employer," and a group of its employees, including Reilly, was allowed to elect to be covered by the Fund pension plan by waiving their rights under the FINAST pension plan. (Stipulation ¶ 7.) Reilly executed such a waiver and elected pension coverage under the Fund.

The Fund provided several types of pensions with varying amounts of benefits for employees of contributing employers. The "Normal Pension" was available to an employee who, *inter alia*, had attained the age of 60 years and had at least 25 years of credited service. Credited service included "past service," *i.e.*, that rendered prior to the employer's joining the fund; a year of past service was defined as at least 135 days of work in a calendar year.

A "Reduced Pension" was available to an employee who, *inter alia*, had attained the age of 60 and had at least 15 years but less than 25 years of credited service. The Reduced Pension amount was that proportion of the Normal Pension amount that the number of years of credited service bore to 25. For example, if an employee had 17 years of credited service, his Reduced Pension would be 17/25 of the Normal Pension amount.

An "Early Retirement Pension" was available to an employee who, *inter alia*, had attained the age of 52 years but was under the age of 60, and who had at least 15 years of credited service. The Fund's plan showed specified percentage reduc-

tions from the Normal or Reduced Pension amounts tied to the age of early retirement. Early retirement at age 59, for example, meant a 6% reduction from the Normal or Reduced Pension amount; early retirement at age 52 meant a 40% reduction.

A "Minimum Thirty Year Service Pension" (hereinafter "30-Year Plan") was available to an employee who, *inter alia*, had at least 30 years of credited service and who did not qualify for any higher pension benefit from the Fund. The amount of the 30-Year Plan benefit was 75% of the Normal Pension benefit amount.

An employee's right to a Fund pension vested when he had attained 52 years of age and had 15 years of credited service with contributing employers.

In 1976, in anticipation of his 52nd birthday, Reilly applied for early retirement benefits under the 30-Year Plan, to be effective in 1977. The Fund denied his application on the ground that he was not entitled to credit for the years 1958 and 1959 and hence did not have the required 30 years of service. (Stipulation ¶¶ 9–11.) Had Reilly received credit in the computation of his pension eligibility for the time he spent in military service in 1958 and 1959, he would have been eligible for full pension benefits under the Fund's 30-Year Plan. (Stipulation ¶ 12.)

### C. *The Proceedings Below*

In 1978, Reilly, represented by the United States Attorney pursuant to 38 U.S.C. § 2022, commenced the present action against the Fund and FINAST for a judgment pursuant to § 2021(b) directing the defendants to pay Reilly benefits under the 30-Year Plan. Both sides moved for summary judgment. The Fund argued that it should not be held liable because (1) Reilly had waived his rights to object to FINAST's calculation of his pension credits, (2) benefits under Fund plans were not keyed to seniority within the meaning of 38 U.S.C. § 2024(d),[1] and (3) Reilly had not

---

**1.** The government, representing Reilly, originally relied on 38 U.S.C. §§ 2021(b)(1), (2), and (3),

and the district court appears to have made its ruling under § 2021(b)(1). Sections 2021(b)(1)

complied with the terms of § 2024(d) by returning to FINAST in April 1959 when he was released from the hospital.

In a decision dated August 1, 1983 ("Decision"), the district court rejected all of the Fund's arguments.[2] It ruled that Reilly's claim was asserted under the Act, not under the terms of the pension plan, and hence had not been waived. The court further ruled that

> regardless of the name used, the credits awarded by the Fund are "perquisites of seniority," *Alabama Power Co. v. Davis,* 431 U.S. 581, 589 [97 S.Ct. 2002, 2007, 52 L.Ed.2d 595] (1977), in the uncomplicated sense that they are rewards for length of time of employment. Thus, the constraints of the Act are applicable to the Fund.

Decision at 3. Finally, the court rejected the Fund's argument that Reilly had failed to comply with the Act by not returning to work at FINAST immediately upon the termination of his hospitalization:

> [I]n view of the stipulation that plaintiff's period of active duty was extended, because of his injury, until August 20, 1959, that he remained in military service from August 21, 1959 to September 4, 1959, and that he returned to work immediately thereafter, Statement of Facts Not in Dispute, ¶¶ 4–5, the Fund's argument on this score is not persuasive.

*Id.* at 4.

The court concluded that "plaintiff's entitlement to [benefits was] manifest from the language of the [Fund's] Plan … and the requirements of the Act," *id.,* and granted summary judgment in favor of

Reilly against the Fund. It dismissed the action against FINAST on the ground that FINAST's agreement with the Fund for the latter to provide pension benefits relieved FINAST of liability to Reilly and placed the entire burden on the Fund.

The Fund has appealed the judgment entered against it in favor of Reilly. No appeal has been taken by any party from the portion of the judgment that dismissed the action against FINAST.

## II. DISCUSSION

On this appeal, the Fund contends principally (1) that it should not be held to its Stipulation that Reilly was on active duty status for the pertinent 15-month period, and that absent the Stipulation, Reilly must be found not to have complied with the requirement of 38 U.S.C. § 2024(d) that he return to FINAST upon his discharge from the hospital; (2) that Reilly waived his rights to pension credits for the 1958–59 period by joining the Fund; and (3) that rights under the Fund's plan are not perquisites of seniority under § 2024. None of these arguments has merit, and only the third requires extended discussion.

### A. *The Stipulation*

As set forth in detail in Part II.C. below, § 2024(d) grants a returning reservist certain rights of reemployment and perquisites of employment "[u]pon [his] release from a period of … active duty." That section provides, however, that

> [i]f [the reservist] is hospitalized incident to active duty for training … [he] shall

---

and (2), however, govern the rights of Armed Services veterans, not those of state National Guard reservists such as Reilly. Throughout the litigation, the Fund has taken the position that the statutory rights of plaintiff as a National Guard reservist are governed by § 2021(b)(3) and by 38 U.S.C. § 2024(d). *E.g.,* Fund brief on appeal at 8; *see Monroe v. Standard Oil Co.,* 452 U.S. 549, 101 S.Ct. 2510, 69 L.Ed.2d 226 (1981). Although § 2024(d) was enacted in 1960, Pub.L. 86–632, 74 Stat. 467 (1960), and § 2021(b)(3) was enacted in 1968, Pub.L. 90–491, 82 Stat. 790 (1968), the Fund has never argued that these sections do not govern its refusal to credit Reilly for his 1958–59 tour of duty. We accept the

Fund's position that § 2024(d) governs the issues now before us.

**2.** The Fund also contended that it was not an "employer" within the meaning of the Act. The court rejected this contention, citing *Bunnell v. New England Teamsters & Trucking Industry Pension Fund,* 486 F.Supp. 714 (D.Mass.1980), *aff'd,* 655 F.2d 451 (1st Cir.1981), *cert. denied,* 455 U.S. 908, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982), which rejected the same contention by the same Fund. The Fund does not pursue this argument on appeal.

be required to report for work at the beginning of the next regularly scheduled work period after expiration of the time necessary to travel from the place of discharge from hospitalization to the place of employment . . . .

The Fund argues here, as it did in the district court, that Reilly was discharged from the hospital in April 1959 with the notation that he was able to perform his duties; it therefore argues that § 2024(d) gives Reilly no rights because he did not return to FINAST until September 1959. This argument is meritless.

The Fund stipulated with Reilly that Reilly's period of active duty status lasted until August 20, 1959; that from August 21, 1959, until September 4, 1959, Reilly remained in military service to fulfill his annual obligation in the National Guard; and that he returned to FINAST immediately upon the fulfillment of this obligation. The stipulation makes it indisputable that Reilly complied with the requirements of § 2024(d).

■ The Fund acknowledges that it entered into this Stipulation but contends that its arguments to the district court constituted a "constructive withdrawal from" the Stipulation. (Fund brief on appeal at 21.) We cannot agree. A party to a stipulation is not entitled to withdraw from its agreement unilaterally. Reilly never consented to any withdrawal by the Fund from the Stipulation, and hence the Fund was bound by the Stipulation unless it could obtain relief by action of the court. The Fund's counsel advised us at oral argument that the Fund did not request such relief, and it is clear that the district court relied on the Stipulation in rendering its decision. Absent some extraordinary circumstance, which is lacking here, this Court is not free to reject a factual resolution that was agreed to by the parties and was deemed binding by the district court. *See Stanley Works v. FTC*, 469 F.2d 498, 506 (2d Cir.1972), *cert. denied*, 412 U.S. 928, 93 S.Ct. 2750, 37 L.Ed.2d 155 (1973).

### B. *The Waiver*

■ Nor is there merit in the Fund's contention that Reilly waived his right to claim credit for his time in military reserve service. Reilly merely elected to become a member of the Fund's pension plan, and waived his interest under the FINAST pension plan. As the district court noted, there is no indication in the document signed by Reilly that he waived his rights under the Act. In the absence of a clear and unequivocal indication that Reilly intended to waive his rights under the Act, we cannot accept the Fund's contention. *See, e.g., Loeb v. Kivo*, 169 F.2d 346, 349 (2d Cir.), *cert. denied*, 335 U.S. 891, 69 S.Ct. 246, 93 L.Ed. 429 (1948).

### C. *The Effect of the Act*

■ Finally, we turn to the more intricate question of whether pension eligibility credit under the Fund's plan is a perquisite of seniority within the meaning of § 2024(d). That section provides, in pertinent part, as follows:

Any employee [who is a reservist whose commitments are for less than three months] shall upon request be granted a leave of absence by such person's employer for the period required to perform active duty for training . . . in the Armed Forces of the United States. Upon such employee's release from a period of such active duty for training . . . such employee shall be permitted to return to such employee's position with such seniority, status, pay, and vacation as such employee would have had if such employee had not been absent for such purposes.

In sum, § 2024(d) provides that reservists with military training obligations lasting less than three months "must be granted a leave of absence for training and, upon their return, be restored to their position 'with such seniority, status, pay, and vacation' as they would have had if they had not been absent for training." *Monroe v. Standard Oil Co.*, 452 U.S. 549, 555, 101 S.Ct. 2510, 2514, 69 L.Ed.2d 226 (1981). This provision and a more general section,

38 U.S.C. § 2021(b)(3),[3] are applicable to Ready Reservists and National Guardsmen. *Id.* at 552 & n. 2, 101 S.Ct. at 2512 & n. 2.

■ The most instructive authority with respect to whether pension rights should be considered perquisites of seniority within the meaning of the Act is *Alabama Power Co. v. Davis*, 431 U.S. 581, 97 S.Ct. 2002, 52 L.Ed.2d 595 (1977). The case involved a claim by a World War II veteran, employed by Alabama Power from 1936 to 1971 except for 30 months in the military and a period on strike, that § 9 of the Military Selective Service Act of 1967, 50 U.S.C. App. § 459(b) (recodified as 38 U.S.C. § 2021), required Alabama Power to give him pension credit for his military service in 1943–45. Section 2021 provides, in pertinent part, that a person who leaves a position (other than a temporary position) with a private employer to serve in the armed forces of the United States shall, if he makes timely application therefor, "be restored by such employer or the employer's successor in interest to such position or to a position of like seniority, status, and pay," § 2021(a)(B)(i); that such restoration "shall be ... without loss of seniority," § 2021(b)(1); and that such restoration shall be

> in such manner as to give such person such status in the person's employment as the person would have enjoyed if such person had continued in such employment continuously from the time of such person's entering the Armed Forces until the time of such person's restoration to such employment, or reemployment,

§ 2021(b)(2). The central question in *Alabama Power* was whether Davis's pension rights were an aspect of the "seniority" protected by § 2021.

Reviewing its past decisions, the Court identified several factors as hallmarks of a seniority right and a number that suggested that the right is not one that accrues with seniority. If a promotion depended on length of service in a job or on some other form of automatic progression, it was a perquisite of seniority; if instead it depended on the exercise of the discretion of the employer, it was not a seniority right. *Alabama Power Co. v. Davis*, 431 U.S. at 585, 97 S.Ct. at 2005; *see Tilton v. Missouri Pacific Railroad Co.*, 376 U.S. 169, 84 S.Ct. 595, 11 L.Ed.2d 590 (1964); *McKinney v. Missouri-Kansas-Texas Railroad Co.*, 357 U.S. 265, 78 S.Ct. 1222, 2 L.Ed.2d 1305 (1958). If a type of payment compensated a right or expectation that accrued as the employee's longevity on the job increased, the payment was a perquisite of seniority; the fact that the amount of the payment might be calculated with respect to a factor other than longevity did not obscure the nature of the right. *Alabama Power Co. v. Davis*, 431 U.S. at 588, 97 S.Ct. at 2006; *see Accardi v. Pennsylvania Railroad Co.*, 383 U.S. 225, 86 S.Ct. 768, 15 L.Ed.2d 717 (1966) (severance pay). If, however, the type of benefit was intended and commonly considered to be a form of short-term compensation for work performed, it was not to be considered a reward for longevity of employment. *Alabama Power Co. v. Davis*, 431 U.S. at 589, 97 S.Ct. at 2007; *see Foster v. Dravo*, 420 U.S. 92, 95 S.Ct. 879, 43 L.Ed.2d 44 (1975) (paid vacation). From these analyses, the Court stated general guiding principles as to whether a benefit is a right of seniority protected by the Act:

> If the benefit would have accrued, with reasonable certainty, had the veteran been continuously employed by the private employer, and if it is in the nature of a reward for length of service, it is a "perquisite of seniority." If, on the other hand, the veteran's right to the benefit at the time he entered the military was subject to a significant contingency, or if the benefit is in the nature of short-term compensation for services rendered, it is not an aspect of seniority within the [Act].

*Alabama Power Co. v. Davis*, 431 U.S. at 589, 97 S.Ct. at 2007.

---

**3.** Section 2021(b)(3) provides in part that such a person "shall not be denied retention in employment or any promotion or other incident or advantage of employment because of any obligation as a member of a Reserve component of the Armed Forces."

The Court concluded that the pension plan before it came within the first branch of the test. It observed that Davis's work history before and after his tour of military duty made it almost certain that he would have accumulated the necessary service credits had he not entered the military. It noted that the Alabama Power plan's 15–20-year vesting requirement suggested that the true nature of the pension payment was a reward for length of service rather than merely deferred compensation for a year of actual service. The Court termed it "obvious that pension payments have some resemblance to compensation for work performed," *id.* at 592, 97 S.Ct. at 2009, that future benefits may be traded off against current compensation in the collective bargaining process, and that future benefits must be funded currently just as are wages. But the Court concluded that "the same observations … can be made about any benefit and therefore are of little assistance in determining whether a particular benefit recompenses labor or rewards longevity with an employer." *Id.* at 593, 97 S.Ct. at 2009.

The Court noted that both the cost to the employer and the payment to the employee depended directly on the length of time the employee continued to work for the employer, and pointed out that a pension plan

> assures employees that by devoting a large portion of their working years to a single employer, they will achieve some financial security in their years of retirement. By rewarding lengthy service, a plan may reduce employee turnover and training costs and help an employer secure the benefits of a stable work force…. The relationship between pension payments and passage of time as an employee is central to both of these functions.

*Id.* at 594, 97 S.Ct. at 2009.

Finally, the Court noted that Alabama Power's pension plan was a "defined benefit" plan, as defined by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002(34) (1982), and it declined to express a view as to whether a "defined contribution" plan, as defined in ERISA, 29 U.S.C. § 1002(35), should be treated differently from a defined benefit plan under the Act. *Alabama Power Co. v. Davis*, 431 U.S. at 593 n. 18, 97 S.Ct. at 2009 n. 18.

Although §§ 2021(a) and (b), at issue in *Alabama Power*, differ from § 2024(d) in the persons covered and, to a slight degree, in language—*compare* § 2021(a)(B)(i) (veterans returning from active service in the regular forces are to be restored "to a position of like seniority") *and* § 2021(b)(1) (such veterans are to be reemployed "without loss of seniority"), *with* § 2024(d) (reservists are to be permitted to return "with such seniority … as [they] would have had")—the question whether a pension benefit is a perquisite of "seniority" is the same under all three sections, and we conclude that the principles set forth in *Alabama Power* are applicable to § 2024(d). The record before us demonstrates that Reilly's claim meets the *Alabama Power* requirements that the benefit be a reward for longevity and be reasonably certain to accrue with length of service, and that it not be simply short-term deferred compensation or be dependent on an exercise of discretion.

An employee's right to benefits under the Fund plan does not depend on any exercise of discretion by the Fund trustees. If the employee meets the age, length of employment, and other general requirements of the plan, he is entitled to have his pension application approved. The trustees must act in accordance with the rules and regulations of the plan.

Further, we cannot view the pension rights under the Fund plan as rights to short-term deferred compensation rather than a reward for longevity in employment. The employee's right to a pension accrues by reason of the length of his service in covered employment. The plan states that it is designed to benefit "employees who have spent long years of service working in the industry." (New England Teamsters and Trucking Industry Pension Plan 1974, at 25.) An employee is not entitled to benefits unless and until he has been em-

ployed for at least 15 years. As compensation, this is surely not short-term; and if the employee is employed by contributing employers for only 14 years, it is not compensation, for it is never received.

Moreover, there is evidence that the years of employment are to some extent more significant than the amount of time spent working. Thus, the Fund gives credit for past employment only if the employee worked at least 135 days during the calendar year; it gives the same one year of credit if the employee worked 250 days; and if an employee worked 405 days in two years, he would receive pension credit for only two years, though if those 405 days were spread evenly over three years, he would be entitled to credit for three years. Thus, the past service pension credits are clearly tied to length of employment.

Given the automatic nature of the accrual of pension credit, there is every reason to believe that Reilly would have qualified for his pension but for his military service. He was first permanently employed by FINAST in 1946; he returned to FINAST immediately after his military service during the Korean conflict; he returned again in 1959 immediately after his tour of active duty with the National Guard; and he remained employed by FINAST until 1977. We are aware of no contingency of any significance that would have prevented him from working for FINAST had his military obligations not interfered, and his employment history leaves little doubt that but for his tour of duty in 1958–59 he would have qualified for the 30-Year Plan without difficulty.

The Fund contends that, notwithstanding the principles laid down in *Alabama Power,* we should conclude that § 2024(d) does not require it to give pension credit to Reilly for three reasons: (1) because *Monroe v. Standard Oil Co., supra,* requires that § 2024(d) be narrowly construed merely to forbid an employer to discriminate against reservists in the terms and conditions of their employment; (2) because the Fund is a defined contribution plan rather than a defined benefit plan; and (3) because the Fund is a multi-employer plan rather than a single-employer plan. The first argument is meritless because *Monroe* does not purport to construe an employee's pension rights. The second and third are based on superficial differences that have no significance for the construction of § 2024(d).

The Fund argues that *Monroe* constitues a retreat from the Court's view expressed in *Alabama Power* that the Act is to be construed liberally in order to give effect to Congress's stated desire to preserve the employment rights and benefits of a person called upon to leave his employment to serve his country's military. *See Alabama Power Co. v. Davis,* 431 U.S. at 584–85, 97 S.Ct. at 2004–2005. *Monroe* does not, however, stand for such a proposition, and we see no inconsistency in effect or in principle between *Monroe* and *Alabama Power.* *Monroe* dealt with an employer's duty under § 2021(b)(3), *see* note 3, *supra,* to accommodate an employee reservist who had been given the mandated leave of absence, but who also sought special benefits in the form of a revised work schedule to permit him to earn extra wages to make up for the time spent at his reserve training. The Court held that § 2021(b)(3) did not require the employer to make such special arrangements. It interpreted the section simply as imposing "nondiscrimination requirements," and prohibiting employers from "discharging or otherwise disadvantaging employee-reservists solely because of their military obligations." 452 U.S. at 565, 101 S.Ct. at 2519. *Monroe* did not in any way involve the employee's pension rights or his other rights of seniority, and it did not in any way cast doubt on § 2024(d)'s protection of such rights.

Next, the Fund attempts to gain mileage from the Supreme Court's disclaimer of a view as to whether the conclusions reached in *Alabama Power* with respect to defined benefit plans were also valid with respect to defined contribution plans. A defined benefit plan is one under which the benefits to which the employee is entitled are fixed, either as a set dollar amount, or as a speci-

fied amount multiplied by the number of years of service, or as a percentage of his wages multiplied by years of service. Under such a plan, the employer may have to adjust its contributions as experience deviates from the actuarial assumptions on which its prior level of contributions was based. *See* Note, *Fiduciary Standards and the Prudent Man Rule Under the Employ[ee] Retirement Income Security Act of 1974*, 88 Harv.L.Rev. 960, 961–62 & n. 12 (1975). A defined contribution plan is one in which the employer's contribution is specified, either as a flat sum or according to a formula. Under such a plan the employee's ultimate level of benefits depends on the fund's rate of return. *Id.* at 961–62. The Fund contends that it is a defined contribution plan and that contributing employers are required to make specific contributions based upon the number of hours worked by an employee or paid for by an employer. Assuming that the Fund is, as it contends, a defined contribution plan,[4] we see no basis in that fact for concluding that the pension rights granted are not a perquisite of seniority.

Preliminarily, we note that during the period in question, *i.e.*, 1958–59, Reilly was covered by the FINAST pension plan. It was not until 1967 that he was covered by the Fund plan and that FINAST was required to make specified contributions on his behalf. The subsequent fixation of FINAST's contributions is irrelevant. If the Act had theretofore given Reilly pension eligibility rights under the FINAST defined benefit plan, no transaction between his employer and his union could deprive him of them. *See Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 285, 66 S.Ct. 1105, 1111, 90 L.Ed. 1230 (1946) ("no practice of employers or agreements between employers and unions can cut down the service adjustment benefits which Congress has secured the veteran under the Act"); *accord Alabama Power Co. v. Davis*, 431 U.S. at 592, 97 S.Ct. at 2008.

Nor do we see any reason in general to distinguish between the two types of plans in the context of preserving seniority rights within the meaning of the Act. So far as appears in the present case, the fact that a plan is a defined contribution plan affects only the manner in which the amount of an eligible employee's benefits are calculated, not the preconditions to his eligibility. The employee's eligibility still depends principally on his age and the number of years he has been employed by contributing employers.[5] The fact that the amount of his benefits may be affected by the investment performance of the pension fund does not make the employee's entitlement to benefits any less a perquisite of his seniority.

Finally, we find no real significance in the fact that the Fund plan is a multi-employer plan. In *Alabama Power*, the Supreme Court described certain advantages to employers in terms of the single-employer type of plan before it, pointing out that a pension plan may help the employer to "reduce employee turnover and training costs and secure the benefits of a stable

---

**4.** The parties entered into an "Additional Statement of Facts Not in Dispute," which included the stipulation that "[t]he Fund *claims* that the pension plan is a defined contribution plan under ERISA." (¶ 9 (emphasis added).) This claim is perhaps supported by the stipulation that "[t]he rate of benefit is based upon the rate of contributions required by the collective bargaining agreements in the last five years of employment immediately prior to retirement." (*Id.* ¶ 7.) However, the specification in the plan itself of precise levels of benefits for, *inter alia*, the Normal Pension, the Reduced Pension, the Early Retirement Pension, and the 30-Year Plan, would seem to suggest that it is a defined benefits plan. *See also Connolly v. Pension Benefit Guaranty Corp.*, 581 F.2d 729, 731–34 (9th Cir.

1978), *cert. denied*, 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 492 (1979).

**5.** The Fund argues that "the undisputed facts stipulate that no service credit is given by the Fund based upon seniority alone." (Fund brief on appeal at 16.) This characterization somewhat misstates the parties' actual stipulation, which was that such credit is not given on the basis of "seniority with any employer." (Additional Statement of Facts Not in Dispute ¶ 8.) We read this stipulation to mean simply that the focus is not on seniority "with a single employer" (Fund brief on appeal at 12), but rather is on seniority on an industry-wide basis.

work force." 431 U.S. at 594, 97 S.Ct. at 2009. The cited employer benefits are not very different from those motivating employers to contribute to an industry-wide pension plan. Although work force stability for some employers may be decreased under a multi-employer plan, for some employers this will bring greater efficiency. Thus, the Fund's pension plan aids contributing employers by "assur[ing] industries with fluctuating manpower needs that employees can be available to meet such needs without the need for retaining excess manpower or costs." (Fund brief on appeal at 13.) Further, when a pension plan recognizes seniority on an industry-wide basis, it becomes more feasible for an employer to hire experienced employees, for long or short periods, who need little or no training.

Most importantly, there is nothing in the multi-employer structure of the plan to change either the fundamental nature of the employee's pension rights or the manner in which he earns those rights. His pension credits are earned primarily on the basis of years of covered employment, and the fact that those years may be served with a number of contributing employers is immaterial.

We conclude that Reilly's right to a pension under the Fund's 30-Year Plan was a perquisite of his seniority, and that the district court therefore properly entered judgment in his favor.

## CONCLUSION

The judgment of the district court is affirmed.